## THE BELGENLAND.*

*(Circuit Court, E. D. Pennsylvania. October 10, 1881.)*

1. ADMIRALTY— COLLISION — STEAM-SHIP — FAILURE TO SEE SAILING-VESSEL — DUTY TO KEEP LOOKOUT ON TURTLE-BACK.

A steam-ship collided with and sunk a bark in mid-ocean in consequence of the bark not having been observed from the steam-ship in time to avoid the collision. The steam-ship had lookouts upon the bridge, but none upon the turtle-back, the reason given being that, although one could have been placed there in safety, he would have been of no use, as the vessel was plunging into a head sea and constantly taking water over her bow.

*Held*, that if the failure to see the bark resulted from the inattention of the steam-ship's lookout she was culpable, and if it resulted from the condition of the atmosphere she was culpable in not having reduced her speed and placed a lookout on the turtle-back.

*Held, further*, that, in the face of evidence that the bark held her course, and that she might have been seen from the steam-ship by proper vigilance, a mere speculative explanation of the steam-ship's presumptive culpability could not be accepted.

The decision of the district court, reported 5 FED. REP. 86, affirmed.

Appeal by the steam-ship Belgenland from the decree of the district court (reported in 5 FED. REP. 86) awarding damages against her upon a libel for collision. The facts are sufficiently stated in the opinion.

*Henry R. Edmunds* and *Morton P. Henry*, for libellant.

*Henry Flanders* and *J. Langdon Ward*, for appellee.

McKENNAN, C. J.:

### FINDING OF FACTS.

(1) Between 1 and 2 o'clock on the morning of September 3, 1879, in mid-ocean, a collision occurred between the Norwegian bark Luna, on her voyage from Humacao, in Porto Rico, to Queenstown or Falmouth, and the steam-ship Belgenland, on a voyage from Antwerp to Philadelphia, which resulted in the sinking of the bark, in the total loss of the vessel and the cargo, and in the drowning of five of her crew.

(2) The wind was between S. W. and W. S. W., and there was not much sea, but a heavy swell. The bark was running free, heading S. E. by E. ½ E., having the wind on her starboard quarter. All her square sails were set except her main royal, and she carried also her fore, main, and mizzen stay-sails and inner jib. Her yards were braced a little, her main sheet was down, but the weather clew was up. She was making about seven and one-half knots. Her watch on deck consisted of the first mate and three men; an able seaman was on the lookout on the top-gallant forecastle, and a capable helmsman was at the wheel. She carried a red light on her port side and a green light on her starboard side, properly set and burning brightly, which could be seen, on

*Reported by Frank P. Prichard, Esq., of the Philadelphia bar.

a dark night, and with a clear atmosphere, at least two miles. The character and location of these lights conformed to the regulations of the bark's nationality, which are the same as those of the British board of trade. About 1:45 o'clock the lookout sighted the white mast-head light of a steamer right ahead, distant, as he thought, about a mile, and reported it at once to the mate, who cautioned the men at the wheel to "keep her steady and be very careful," and the bark held her course. No side lights on the steamer were seen from the bark, but, as the vessels approached each other, the white light of the steamer gradually drew a little on the port bow of the bark for three or four minutes. The mate of the bark, seeing the steamer's sails, and that she was heading directly for the bark, was close aboard of her, and reasonably apprehending that a collision was inevitable, ordered the bark's helm hard a-port. In a few seconds the steamer's starboard light came into view, and in another instant she struck the bark on her port side, cutting her in two obliquely from the after-part of the fore rigging to the fore-part of the main rigging.

(3) The Belgenland was steering N. W. by W. $\frac{1}{2}$ W. by compass, and making about 11 knots. Her second officer had charge of the deck, and his watch was composed of 10 able seamen, two quartermasters, the second boatswain, and the fourth officer. One able seaman was stationed on the lee or starboard side of the bridge as a lookout. The second officer was on the bridge. The fourth officer was stationed at the after or standard compass, which was near the mizzen-mast, but at the time was on the bridge, having come there to report a cast of the log. A quartermaster was at the wheel. The rest of the watch were underneath the turtle-back or top-gallant forecastle. The steamer was 416 feet long and about 38 feet beam. The bridge was 150 or 180 feet from her bow, and was six or seven feet higher than the top of the turtle-back, which was about 25 feet above the water. The steamer had her fore, main, and mizzen try-sails, fore stay-sail and jib set and drawing, and probably her jigger also. She heeled to starboard from 10 to 15 degrees.

(4) The only lookout on the steamer was on the bridge. None was on the turtle-back, although it would have been entirely safe to station one there, for the alleged reason that the vessel was plunging into a head sea and taking so much water over her bows that he would have been of no use there.

(5) The bark was not seen by those in charge of the steamer until just at the instant of the collision, when the second officer saw her head-sails just across the steamer's bow; the lookout in the lee side of the bridge saw her after-sails and stern.

(6) The moon was up, but was obscured by clouds. There was no fog, but occasional rain, with mist, and the wind was blowing from the S. W. to W. S. W.

(7) Objects could be seen at the distance of from 500 yards to a mile. The mast-head light of the steamer was sighted and at once reported by the lookout on the bark, at the distance of about a mile; the port light of the bark was seen by a steerage passenger on the steamer, looking out of his room just under the bridge, and reported to his room-mates long enough before the collision to enable the second steerage steward, who heard the report, to go up the companion ladder, cross the deck, and reach the steamer's rail.

After the collision the mizzen-mast of the bark was all of her above water, and this was distinctly seen from the steamer when she was at the distance of 500 yards from it.

(8) The damages caused by the collision were assessed at $50,248.23.

## CONCLUSIONS OF LAW.

The following conclusions are fairly deducible from the evidence and the facts found:

(1) That the vessels were approaching each other from opposite directions, upon lines so close to each other as to involve the necessity of a deflection by one or the other of them to avoid a collision.

(2) That the lookout on the bark saw the steamer when she was nearly a mile distant, and she was held steadily on her course, and that she thereby fulfilled her legal obligation. Even if her helm was ported it was at a time and under circumstances which did not involve any culpability on her part.

(3) That it was the duty of the steamer to keep out of the way of the bark, and, to that end, so to change her course as to preclude all danger of collision.

(4) That the bark could and ought to have been seen by the steamer when they were sufficiently distant from each other to enable the steamer to give the bark enough sea-room to avert any risk of collision. In this failure to observe the bark the steamer was negligent.

(5) No satisfactory or sufficient reason is furnished by the respondent's evidence for this failure of observation. If it resulted from the inattention of the steamer's lookout, or because their vision was intercepted by her fore try-sail, she was clearly culpable. If it is explicable by the condition of the atmosphere, no matter by what cause it was produced, it was the steamer's duty to reduce her speed, and to place a lookout on her turtle-back. An omission to observe these precautions was negligence. But, considering the proof that the bark held her course, and that the steamer might have seen her by proper vigilance, when suitable precaution against collision might have been taken, a mere speculative explanation of the steamer's presumptive culpability cannot be accepted as sufficient.

I do not deem it necessary to enforce these conclusions by extended argument. The whole case is so clearly and satisfactorily treated by the learned judge of the district court that I adopt his opinion, and affirm the decree entered by him.

A decree will, therefore, be entered in this court against the respondent for $50,248.23, with interest from March 25, 1881, and costs.